# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ENVIRONMENTAL TECTONICS** | : | |
| **CORPORATION and** | : | |
| **ENVIRONMENTAL TECHNOLOGY** | : | |
| **CORPORATION,** | : | **CIVIL ACTION** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **NO. 05-6412** |
| | : | |
| **WALT DISNEY WORLD CO. d/b/a** | : | |
| **WALT DISNEY IMAGINEERING,** | : | |
| **Defendant.** | : | |

## OPINION

**STENGEL, J.**                                                **March 26, 2008**


This unfair competition and breach of contract case involves the design of the *Mission: Space* attraction at Disney World. Plaintiff seeks damages for Walt Disney Imagineering's alleged breaches of confidentiality agreements, misappropriation of pre-existing information, and "clouding the title" to ETC's pre-existing technology by falsely claiming that it was invented by Disney. The defendant moved for summary judgment. After hearing oral argument, and for the reasons outlined below, I will grant summary judgment on all counts, dismissing the plaintiffs' complaint.

1

## TABLE OF CONTENTS

I.   BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     A.   Developing *Mission: Space* and the Agreement for Professional Services
          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     B.   Building *Mission: Space* and the Material Procurement Contract. . . . . . . 3
     C.   ETC's Installation Plan: A Separate Confidentiality Obligation. . . . . . . . . 6
     D.   The November 15, 2001 Settlement Agreement. . . . . . . . . . . . . . . . . . . . . 7
     E.   ETC's Vendor List. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
     F.   Oral Agreement on the Appearance of *Mission: Space* Title Blocks. . . . . . 8
     G.   ETC's Unfair Competition Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.  PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III. LEGAL STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV.  DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
     A.   Count I: Breach of Contract – Confidentiality. . . . . . . . . . . . . . . . . . . . . . 13
          1.   Confidentiality Claims under Material Procurement Contract Article
               23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
               a.   November 15, 2001 Release. . . . . . . . . . . . . . . . . . . . . . . . 14
               b.   Waiver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
               c.   Ownership and Confidentiality Rights under the
                    Material Procurement Contract. . . . . . . . . . . . . . . . . . . . . . 21
                    (i)   Ownership under Article 28
                    (ii)  Confidentiality Protection under Article 23
               d.   Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
          2.   Disclosure of ETC's Installation Proposal and Theft of Its Vendor
               List. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
     B.   Count II: Breach of Contract – Oral Agreement on Title Blocks. . . . . . . . 35
     C.   Count III: Unfair Competition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
          1.   ETC's Unfair Competition Claim.. . . . . . . . . . . . . . . . . . . . . . . . . 38
          2.   Statute of Limitations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
          3.   Gist of the Action Doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

V.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

I.   **BACKGROUND**

A.   Developing *Mission: Space* and the Agreement for Professional Services

Walt Disney World Co. d/b/a Walt Disney Imagineering ("Disney") began

working with Environmental Tectonics Corporation and Entertainment Technology

Corporation (collectively, "ETC") in the summer of 1998.  At that time, Disney and ETC

entered into an "Agreement for Professional Services, Fixed Price" ("Professional

Services Agreement"), that essentially allowed Disney to use ETC's facilities and services

in designing a new ride attraction, called *Mission: Space*.  ETC performed a series of

"discrete tasks" under the Professional Services Agreement between August 1998 and

December 1999 in relation to the *Mission: Space* project.

As considerable confidential information began to pass between them during the

design process, ETC and Disney formed a separately negotiated, reciprocal

Confidentiality Agreement in December of 1998.  This Agreement barred Disney from

disclosing ETC's confidential information in connection with the *Mission: Space* project.

Based on research performed by both parties under the Professional Services Agreement,

Disney formulated the Design Requirements Specifications for *Mission: Space*, a draft

version of the master blue-print for building *Mission: Space*.

B.   Building *Mission: Space* and the Material Procurement Contract

In January 1999, Disney requested bids from ETC and three other potential

contractors to manufacture the ride on the basis of the Design Requirements

3

Specifications.  Rather than submit a bid based on the outstanding Design Requirements

Specifications, ETC presented Disney with an "alternative concept for *Mission: Space*

using centrifuge technology and know-how,"[1] shortly after July 20, 1999.  On August 16,

1999, ETC and Disney executed Change Order No. 12 to the Professional Services

Agreement, permitting Disney to incorporate ETC's alternative concept into a revised

Design Requirements Specifications, which Disney finalized in September 1999.[2]

Ultimately, in early 2000, ETC and Disney entered into a written contract (the Material

Procurement Contract),[3] to build the centrifuge-based ride, *Mission: Space*, at Walt

Disney World's Epcot Center in Orlando, Florida, for a fixed price of $28,404,017.

Two key provisions of the Material Procurement Contract govern the majority of

ETC's breach of confidentiality claims: Article 28 (Ownership and Deliverables;

Exclusivity), and Article 23 (Confidentiality).  Article 28 allocates ownership of "data,

---

[1]Statement of Material Facts which ETC Contends Precludes Summary Judgment (hereinafter "Pl.'s Mat. Facts") ¶ 20.  According to ETC's Response to Defendant's Statement of Facts in Support of the Motion of Defendant for Summary Judgment (hereinafter "Pl.'s Resp. Facts"), the format or "concept" of the *Mission: Space* ride involved a "multi-arm centrifuge" to mimic gravitational ("g") forces, rather than a roller coaster or a turntable.

[2]The parties disagree over the intended effect of Change Order No. 12 to the Professional Services Agreement.  ETC asserts that Change Order No. 12 only obligates it to create a full-scale prototype of its proposed design concept; Disney maintains that it purchased the concept altogether through Change Order No. 12.  (See Pl.'s Mat. Facts ¶¶ 20-23.)

[3]Again, according to ETC, "a significant dispute between ETC and Disney is that Disney views this agreement as entitling it to own everything that ETC was working on during this period."  (See Opp'n Br. ¶ 2.)  The Material Procurement Contract established a new contractual relationship between the parties, though the disputes relevant to this case span the entire extent of the parties' dealings with each other.

know-how, processes, concepts and technology" as well as "deliverables" as defined in

the Article itself.[4]  The parties agree that Article 28, at a minimum, grants Disney a

royalty-free license to utilize information contained in deliverables in the course of going

forward with the ride project.  The impact of this provision on pre-existing information

and know-how developed independently by ETC, on the other hand, is central to the

dispute between the parties.  Plaintiff claims that Article 28 assigns ownership and

confidentiality rights to ETC for pre-existing information and know-how.  Disney

counters that all of the information that passed between the two companies falls under the

definition of "deliverables," and consequently belongs to Disney.  It follows that

information proprietary to Disney could not logically violate the Material Procurement

Contract's confidentiality provision, and this is defendant's argument with respect to

Article 28.

Article 28 of the Material Procurement Contract also subjects pre-existing

information and know-how to the confidentiality protection of Article 23.  The operative

language of Article 23 requires written permission before either party may disclose

"information . . . which may not be accessible or known to the general public." (Def.'s

---

[4]"Deliverables" are defined as (but not limited to): "drawings data, progress reports, materials or designs, tooling, spare parts information, electronic media, microfilm, shipping documents, and any other work product requirements . . ."  Material Procurement Contract, Art. 28(a); (See Def.'s Br. Ex. 2.)  While Article 28(a) grants ownership over deliverables to Disney, Article 28(e) reserves ownership of ETC's ride concept to ETC, as well as ETC's pre-existing data, know-how, processes, concepts, and technology.  Ownership under Article 28, read together with the previous "Agreement for Professional Services," is a principal matter of dispute between the parties.

Mat. Facts ¶ 27.)  ETC claims, in Count I, that Disney breached Article 23 of the Material

Procurement Contract by disclosing such information to sub-vendors without first seeking

permission from ETC.

     C.    ETC's Installation Plan: A Separate Confidentiality Obligation

     Unlike the other breach of confidentiality claims contained in Count I, ETC's

allegation that Disney copied and disclosed a confidential ETC installation plan does not

arise under the Material Procurement Contract.  Under the Material Procurement

Contract, ETC agreed to design, furnish and deliver the ride system, but the actual

installation of the ride was not within the scope of that agreement.  In the absence of an

agreement for the installation of *Mission: Space*, Disney approached ETC separately for a

proposal to install the ride at Epcot.  ETC submitted an installation plan on December 17,

1999.  In Count I of the complaint, ETC claims that Disney engineer Edward Fritz

illegally removed ETC's name from the installation plan and, in violation of a

confidentiality notice on the plan itself, used this "generic" version to get a competitive

bid from a third party, Taft Contracting Company.

     Disney's actions relating to the installation plan occurred before the parties agreed

to the Material Procurement Contract, making Article 23 inapplicable.  Drafting the plan

was not an obligation under the Professional Services Agreement.  Therefore, the only

confidentiality provision that ETC relies upon for this claim is the notice on the

installation plan itself.  The "Notice of Confidential Data" prohibits disclosure of

information contained in the document outside the Disney organization other than "to evaluate the Proposal," and only to the extent that the information cannot be obtained from another source.

D.    The November 15, 2001 Settlement Agreement

Both Disney and ETC describe various setbacks that occurred throughout 2001. Things did not go well as they tried to work under the framework and schedule of the original Material Procurement Contract.  ETC cites "dozens of scope changes that Disney was making which dramatically and unilaterally changed what ETC was expected to accomplish."  (Pl.'s Mat. Facts ¶ 36.)  Meanwhile, Disney threatened to terminate the contract altogether due to ETC's failure to comply with various Contract Directives.  (See Def.'s Mat. Facts ¶ 34; Def.'s Br. Ex. 3, "Notice of Material Breach of Contract.")

In mid-2001, in an effort to remedy the tension between them, and to streamline the construction of *Mission: Space*, Disney proposed converting the Material Procurement Contract from a fixed price contract to a time and materials contract. On November 15, 2001, Disney and ETC succeeded in restructuring their agreement.  The restructuring resulted in the November 15, 2001 Settlement Agreement, which contained, inter alia, a release of claims on behalf of ETC.[5]  Disney argues that through this provision in the

_____

[5]It is clear that the November 15, 2001 Settlement Agreement effected changes in the Material Procurement Contract related to the disputes that had arisen between the parties at that time.  The parties, citing industry parlance, explain that the November 15, 2001 Settlement Agreement is simply titled "Change Order No. 22" to the Material Procurement Contract.  The two titles are synonymous, and are used interchangeably here.

November 15, 2001 Settlement Agreement, ETC released many of the contract claims it

has asserted in this case and which are presently at issue on summary judgment.

E.    ETC's Vendor List

As part of its breach of contract claim, ETC alleges that Disney "stole" a list of

vendors used in the construction of *Mission: Space*.  While the parties were negotiating

the contract conversion in mid-2001, ETC contends that "out of concern that ETC might

stop work at the suggestion of a contract conversion, Disney set out to steal ETC's vendor

information so that it could improperly use it if ETC did not agree to act as Disney's

subcontractor."  (Pl.'s Mat. Facts ¶ 38.)  This allegation stems from a July 7, 2001 email

from Disney engineer Edward Fritz to several other Disney employees, attaching a list of

vendors involved on the *Mission: Space* project.  Disney claims to have compiled the list

of vendors from information generally known to its engineers simply by dint of their

involvement with the *Mission: Space* project.

F.    Oral Agreement on the Appearance of *Mission: Space* Title Blocks

Count II alleges that Disney breached oral agreements relating to the use of joint

title blocks[6] on drawings prepared for the *Mission: Space* ride by ETC.  ETC claims that

---

[6]According to Disney's Statement of Material Facts,
> A title block is the designation in the lower right-hand corner of a design
> drawing which contains the name of the creator, a block of text notifying
> readers that the information contained therein is proprietary to whomever
> owns the technology incorporated therein and additional information
> unique to the drawing so that it easily can be identified.

(Def.'s Mat. Facts ¶ 44.)

Disney violated these agreements by removing ETC's name from the title blocks for drawings prepared by ETC, replacing them with a Disney title block.  ETC points to over 100 drawings with altered title blocks.  (See Pl.'s Mat. Facts ¶ 48.)  Though ETC admits to having discovered the removed title blocks prior to the November 15, 2001 Settlement Agreement, the plaintiff also claims to have learned of new violations only after that date.  (See Compl. ¶ 76; Pl.'s Mat. Facts ¶ 48.)  ETC cites no further evidence of the oral agreements on which it bases these allegations.  (See Pl.'s Mat. Facts ¶ 48.)

According to the Design Requirements Specifications, applicable to title block format for drawings developed under the Material Procurement Contract, ETC could vary the title blocks only in one limited and specific way, by replacing a picture of "Sorcerers Mickey" with the "vendor's name, logo, or company identifier."  (See Def.'s Mat. Facts ¶ 47.)  Disney argues that the Design Requirements Specifications language is definitive on the acceptable title block format, and that any variation could have been negotiated during the contract conversion in mid-2001.  (See Def.'s Mat. Facts ¶ 57, "Change Order No. 22 made no change to the original drawing and title block provisions, but rather expressly stated that unless changed therein, all other contract terms remained the same.")

G.     ETC's Unfair Competition Claim

Count III of the complaint alleges that Disney engaged in unfair competition as defined by Pennsylvania law leading up to and following the opening of *Mission: Space* in July 2003.  Through press releases and other statements about the design and

installation of the ride, Disney allegedly misrepresented ETC's contributions and

suggested that there was a "cloud on the title" to the *Mission: Space* design, undermining

ETC's ability to compete for similar centrifuge-based ride projects at other potential

locations.  In its Statement of Material Facts, ETC cites several examples of alleged

misrepresentations:

   (1)    An August 18, 2003 Orlando Sentinel article quoting the President of Walt Disney Parks and Resorts to say that *Mission: Space* is "a statement in technology that no one else can make."

   (2)    Press reports suggesting that Disney cooperated with NASA in developing *Mission: Space*, without mentioning ETC's involvement.

   (3)    A January 2004 article by writer Tom Bissell, stating that "[t]he simulation technology for *Mission: Space* as it was envisioned did not exist, so Imagineering invented it."

   (4)    A mid-2005 statement by Michael Lentz of Disney to Sandra Klim of AAA MidAtlantic, claiming that "we didn't start with an existing technology and wrap a theme around it . . . *Mission: Space* is a uniquely created ride system."

   (5)    A Walt Disney World Press Release referring to *Mission: Space* as a "custom ride system" and a "technological landmark first introduced in a Disney theme park."

(See Pl.'s Mat. Facts ¶¶ 50-55.)

Disney disputes the assertion that these statements constitute misrepresentations or

form part of an effort to "cloud the title" to the technology behind *Mission: Space*.

## II.   PROCEDURAL HISTORY

A related case before the court also involves contract and tort claims arising from

this dispute (Civil Action No. 03-3546, filed June 9, 2003).  As the first case approached

trial, ETC filed the present action, and upon the parties' stipulation, the court entered an

Order staying the first litigation pending completion of the present litigation.  (Civil

Action No. 03-3546, Docket No. 81; Civil Action No. 05-6412, Docket No. 8.)  ETC's

second complaint, i.e. this case, contains three counts:

> (1)   Breach of Contract: (A) breaches of confidentiality provisions in the
> Material Procurement Contract.  ETC accuses Disney of divulging
> confidential, ETC information to third party vendors working on *Mission:
> Space* in a "cavalier manner."  According to ETC, Disney "divulg[ed]
> Plaintiff's confidential information to persons, firms or corporations
> without first having obtained the written permission [and] without putting a
> confidentiality agreement in place with the recipient of the confidential
> information," and (B) improper copying and disclosure of ETC's
> installation proposal.

> (2)   Breach of Contract: breach of an oral agreement on the appearance of title
> blocks for drawings related to *Mission: Space*.

> (3)   Unfair Competition: including misrepresentations of the origin of *Mission:
> Space* and "clouding of the title" to the technology behind *Mission: Space*.

Disney has now moved for summary judgment on each of these claims.  For the

reasons discussed below, I will grant the defendant summary judgment on all counts in

the complaint.

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such

that a reasonable jury could return a verdict for the non-moving party.  <u>Anderson v.</u>

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.  The court must decide not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  Id. at 252.  If the non-moving party has exceeded the mere scintilla of evidence threshold and

has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent.  Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

IV.   **DISCUSSION**

A.   Count I: Breach of Contract – Confidentiality

ETC claims that Disney breached the confidentiality agreement contained in Article 23 of the Material Procurement Contract, as well as a separate confidentiality notice contained in its installation proposal for the *Mission: Space* ride.  ETC also suggests that Disney personnel stole a confidential list of vendors in advance of the parties' settlement discussions in the fall of 2001.  These claims are discussed separately in this section. The parties agree that Florida law applies to ETC's contract claims in accordance with Article 30 of the Material Procurement Contract, and they do not dispute that Florida law should also govern the interpretation of the Settlement Agreement, which, as part of Change Order No. 22, was made "subject to the terms and conditions of the [Material Procurement Contract]," including Article 30.[7]  (See Def.'s Br. Ex. 6 ¶ 10.)

*1.   **Confidentiality Claims under Material Procurement Contract Article 23***

Disney argues that the November 15, 2001 Settlement Agreement released all of

---

[7]Article 30 of the Material Procurement Contract reads: "[t]his Contract shall be construed and interpreted in accordance with the laws of the State of Florida."  See Nationwide Mut. Ins. Co. v. West, 807 A.2d 916, 920 (Pa. Super. 2002) ("In contract disputes, Pennsylvania courts generally honor the parties' choice of law provisions.")

ETC's breach of confidentiality claims.  I find Disney's interpretation of the contractual

terms inaccurate and overbroad.  At oral argument, Disney advanced a waiver defense,

also pleaded in its Answer, in relation to ETC's breach of confidentiality claims arising

under the Material Procurement Contract occurring after the November 15, 2001

Settlement Agreement.  (See Answer 14; Hr'g Tr. 22:7-25.)  The effect of the release will

be discussed in this section.  Defendant's waiver argument is addressed in the next

section.

     *a.*    *November 15, 2001 Release*

Settlement agreements are interpreted and governed by contract law.  See, e.g.,

Barone v. Rogers, 930 So. 2d 761, 764 (Fla. 4th DCA 2006).  The interpretation of a

contract is generally a question of law for the court.  See DEC Elec., Inc. v. Raphael

Constr. Corp., 558 So. 2d 427 (Fla. 1990); see also Stornawaye Props., Inc. v. Moses, 76

F. Supp. 2d 607, 615 (E.D. Pa. 1999) ("The courts of Pennsylvania have traditionally

determined the effect of a release using the ordinary meaning of its language . . . .").

However, where the wording of an agreement is ambiguous, its interpretation involves

questions of fact, precluding summary disposition.  See Ieracitano v. Shaw, 815 So. 2d

787 (Fla. 4th DCA 2002); Universal Underwriters Ins. Co. v. Steve Hull Chevrolet, Inc.,

513 So. 2d 218 (Fla. 1st DCA 1987).  Contract language is ambiguous where it is

susceptible to two or more equally reasonable interpretations.  Miller v. Kase, 789 So. 2d

1095, 1097-98 (Fla. 4th DCA 2001); Commer. Capital Res., LLC v. Giovannetti, 955 So.

2d 1151, 1153 (Fla. 3d DCA 2007).

The release contained in the November 15, 2001 Settlement Agreement covers claims arising before November 15, 2001.  It cannot reasonably be read to cover claims arising after that date.  There is some ambiguity with respect to unknown or undiscovered claims as of November 15, 2001.  The relevant language states:

> In consideration of Disney's agreement to the Contract [the Material Procurement Contract] conversion and settlement terms defined in Change Order No. 22, dated November 15, 2001, EntCo and ETC hereby fully release and discharge Disney from any and all liability to EntCo and ETC arising out of the Contract as of the date of this Agreement, including but not limited to claims for breach of confidentiality.

(See Def.'s Br. Ex. 6.)  Change Order 22, which converted the Material Procurement Contract from a "fixed price" contract to a "time and materials" contract, also contains the following language by way of preamble:

> This contract conversion was proposed and agreed to during negotiations between both parties to address the settlement of all outstanding disputes and issues to date.

(See Opp'n Br. Ex. 41, 1, "Scope of Work.")  The known claims existing at the time of settlement negotiations, i.e. pre-November 15, 2001, included Disney's improper disclosure of ETC's designs to (1) Rod Millen Designs, Things and Ideas, (2) Frank Weigand and (3) TPI Composites.  (Def.'s Br. 6; Mike Lentz, Exec. Dir., Attractions Dev't, Disney, Aff. ¶ 6, May 11, 2007 (hereinafter "Lentz Aff.").)[8]  Disney argues that the

_____

[8] (See also Def.'s Br. Ronald Averell, Senior Systems Engineer, ETC, Dep. 21:16-23:9; 33:8-34:1; 34:13-16 (identifying Frank Weigand, TPI and Rod Millen); Opp'n Br. Ex. 44 (Objections and Responses to Disney Interrogatories) (failing to identify the "third parties" to

language cited above not only releases liability for these claims, but also constitutes a general release of all claims, including unknown claims and claims that had not matured at the time of the Settlement Agreement.[9]   Disney's argument that any "disclosures" by Disney <u>after</u> November 15, 2001 were also released by ETC under the Settlement Agreement is overwrought.  (<u>See</u> Def.'s Br. 7-8.)  In fact, Disney is trying to extend a negotiated release, confirmed on a specific date (November 15, 2001), to apply to any dispute, past, present or future, that could arise between these two parties.

In order to constitute such a broad release, the language must be clear and unambiguous.  In the context of general releases of liability, ambiguity as to the scope of a release often arises with respect to: (1) claims that may have existed at the time of the release, but had not yet accrued, (2) claims that existed at the time of the release, but were unknown to either one or both parties, and (3) future claims.  <u>See, e.g.</u>, <u>Floyd v. Homes Beautiful Const. Co.</u>, 710 So. 2d 177, 178-79 (Fla. Dist. Ct. App. 1998) (finding a release of "any claim or cause of action presently existing, whether known or unknown" to be

------

whom confidential information was disclosed without permission for claims prior to November 15, 2001).)

[9]The only evidence of record discussing specific post-Settlement Agreement breaches can be found in Exhibit 44 to ETC's Opposition Brief.  There, the plaintiffs allege illegal disclosures to TPI in December 2001, to Frank Weigand in December 2001, to Mark Miller of Miller Software (no date), to Quartus Engineering in January 2002, and to Oceaneering in February 2002.  (<u>See</u> Opp'n Br. Ex. 44, 5-6.)  Disney has furnished a February 7, 2002 letter between Cliff Russell, ETC General Counsel, and Peter Steinman, chief lawyer for Disney discussing post-settlement claims, but that document does not cite specific instances of improper disclosures.  (<u>See</u> Def.'s Br. Ex. 5.)

ambiguous because it was unclear that "presently existing" claims included causes of action arising from defects which existed, but were unknown to the parties at the time of the release; in other words, the court found the release language ambiguous concerning when a "cause of action" was barred: upon accrual, or at some point before accrual); Gulf Group Holdings, Inc. v. Coast Asset Mgmt. Corp., Civ A. No. 04-20850, 2007 WL 496733, at *12 (S.D. Fla. Feb. 13, 2007) (under Florida law, a release "cannot affect a claim that has not yet matured") (citing Xanadu of Cocoa Beach Inc. v. Zetley, 822 F.2d 982, 986 (11th Cir. 1987)); cf. Braemer Isle Condo. Ass'n Inc. v. Boca Hi, Inc., 632 So. 2d 707, 707 (Fla. Dist. Ct. App. 1994) (applying a release to identical post-release claims, where the language of the release in question explicitly cited "both known and unknown" claims, and "all future claims").

In this case, Disney argues that ETC released even claims arising after the parties executed the November 15, 2001 Settlement Agreement. This reading of the release is patently unreasonable. The language is limited to claims arising out of the Material Procurement Contract "as of the date" of the Settlement Agreement. The post-Settlement Agreement breach of confidentiality claims are not released and must survive summary judgment.

Ambiguity as to the scope of the release also prevents summary judgment with respect to unknown or undiscovered claims arising before the November 15, 2001 release. See Miller, 789 So. 2d at 1097-98. The language of the release is not clear on this point,

17

as evidenced by the opposing interpretations advanced by the parties.  Because the relevant language is ambiguous, its interpretation is a factual issue for the jury.  Id.  The phrase "as of the date of this agreement," could reasonably be read to release unknown claims, as Disney proposes; the language could equally cover only claims that had been identified and discussed during settlement negotiations, as ETC argues.  (See Def.'s Br. 7 ("any alleged disclosures by Disney prior to November 15, 2001 were expressly and unambiguously released by ETC by the terms of the Settlement Agreement"); Opp'n Br. Ex. 13, William F. Mitchell, Jr. Dep. 248:5-250:2 (discussing the areas of potential litigation discussed during settlement negotiations).)

However, a thorough review of the record fails to produce a single identifiable instance of a confidentiality breach under the Material Procurement Contract that occurred before November 15, 2001, but was not known to ETC at that time.[10]  Mere allegations that claims exist cannot defeat the defendant's motion for summary judgment whether or not issues of fact remain as to the scope of the release itself.  Anderson, 477

---

[10]Though far from candid regarding specific instances of Disney violations, ETC appears to argue that its allegations regarding the disclosure of its installation plan to a third party by Disney, and the theft of an ETC vendor list, would constitute breach of confidentiality claims arising before the settlement discussions, but not discovered until after the release had been executed.  (See Opp'n Br. Ex. 44, Resp. to Disney Interrogatory #1 (citing both installation plan and vendor list; failing to name a single third party to whom any confidential information was disclosed); Sur-Reply Br. 5 (citing Pl.'s Mat. Facts ¶¶ 43-45, where ETC again declines to name a single specific instance of unknown claims arising before November 15, 2001); cf. Sur-Reply Br. 6 (citing installation estimate as evidence of damages under Count I).)  Both allegations are beyond the scope of ETC's breach of confidentiality claim and are dismissed on other grounds below, at Section III(A)(1).

U.S. 242, 249-52 (1986) (mere allegations are not evidence of facts and may not defeat properly made summary judgment motion).

In sum, the language of the release does not bar ETC from raising breach of confidentiality claims that arose after the November 15, 2001 Settlement Agreement. ETC has simply not identified any claims unknown to it during settlement negotiations; I therefore do not reach the issue of ambiguity as to whether ETC released claims *vel non* of this nature in the November 15, 2001 Settlement Agreement.  The only remaining Count I claims to consider are the post-Settlement Agreement allegations specifically identified in the record.  See supra, n.10.

      *b.*    *Waiver*

At oral argument, Disney suggested that ETC's failure to raise post-November 15, 2001 breaches of confidentiality until several years after the first evidence of such disclosures waives ETC's right to litigate these claims in the present case.  (See Hr'g Tr. 11:7-12:9; 22:7-23:2.)  Waiver is the intentional relinquishment of a known right. O'Brien v. O'Brien, 424 So. 2d 970, 971 (Fla. 3rd DCA 1983); Goodwin v. Blu Murray Ins. Agency, Inc., 939 So. 2d 1098, 1104 (Fla. 5th DCA 2006); BMC Industries, Inc. v. Barth Industries, Inc., 160 F.3d 1322, 1333 (11th Cir. 1998) ("Although the UCC does not specifically lay out the elements of waiver, we have stated that waiver requires (1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual constructive knowledge thereof; and (3) an intention to

relinquish such right, privilege, advantage, or benefit.") (internal quotations omitted) (citing Florida law).

Waiver can be implied by conduct, but the conduct must be clear. Goodwin, 939 So. 2d at 1104. Disney has the burden of proving waiver as an affirmative defense. Mercede v. Mercede Park Italian Restaurant, Inc., 392 So. 2d 997, 998 (Fla. 4th DCA 1981). Typically, a waiver defense will involve questions of fact inappropriate to resolve on summary judgment. See, e.g., Goodwin, 939 So. 2d at 1104 ("[W]aiver is a factual issue to be determined by the finder of fact."); Scheibe v. Bank of America, N.A., 822 So. 2d 575, 575-76 (Fla. 5th DCA 2002) ("[Q]uestions of waiver and estoppel typically involve fact issues inappropriate for summary judgment . . . ."). Under Florida law, courts consistently hold mere delay insufficient to support a defense of waiver. See, e.g., Goodwin, 939 So. 2d at 1104; Mercede, 392 So. 2d at 998; Air Prods. & Chem., Inc. v. Louisiana Land & Exploration Co., 867 F.2d 1376, 1380 (11th Cir. 1989) (holding, under Florida law, that no clear waiver shown after five-year delay); O'Brien, 424 So. 2d at 971.

In this case, Disney's waiver argument is insufficient to defeat the remaining, post-November 15, 2001 breach of confidentiality claims on summary judgment. A discussion of waiver appears nowhere in its briefs, though Disney bears the burden of proving each element of the defense. See Mercede, 392 So. 2d at 998. At oral argument, Disney cited only ETC's "dilatory filing" of the present action as evidence to support waiver. This is insufficient under Florida law. See, e.g., Goodwin, 939 So. 2d at 1104. Disney cannot

20

prove, on this record, ETC's intent to relinquish a known right.  The most Disney can show is that ETC filed this case during the course of litigating another related case.  Under these circumstances, I will not find that ETC has waived its breach of contract claims arising after November 15, 2001.

      c.    *Ownership and Confidentiality Rights under the Material Procurement Contract*

Disney next raises two arguments in favor of summary judgment on ETC's Count I claims based on the language of the Material Procurement Contract itself.  First, Disney argues that Article 28 of the Material Procurement Contract granted Disney "unfettered" ownership over "deliverables."[11]  Ownership of deliverables would bar ETC from claiming that such items, as defined by the Material Procurement Contract, remain subject to the confidentiality provisions of Article 23 of the Material Procurement Contract.  (See Def.'s Br. 8.)  Disney concludes that it is therefore entitled to summary judgment on ETC's breach of confidentiality claims under the Material Procurement Contract.  Second, Disney contends that ETC was required to identify pre-existing, ETC-proprietary information in order for Article 23's confidentiality protection to apply in the first place.

---

[11]As discussed in n.4, *supra*, "deliverables" refers generally to tangible work product generated under the Material Procurement Contract, such as drawings, materials, progress reports and shipping documents.  Even after extensive briefing and oral argument, ETC has failed to identify with any degree of specificity the items or information over which it claims to exercise proprietary rights.  Indeed, plaintiff has offered nothing beyond nebulous descriptions of "pre-existing technology" to define the objects or information at the heart of this case.  I assume, for the purpose of addressing Disney's argument in this section, that ETC passed some if not all of its allegedly "pre-existing technology" to Disney in the form of "deliverables" – that is, actual, tangible work product created through performance of the Material Procurement Contract.

(See Def.'s Br. 9 n.5.)  According to Disney, ETC's failure to identify proprietary information precludes its breach of confidentiality claim under Article 23.  In the alternative, Disney asserts that Article 23 imposes an "implied reasonableness requirement" on ETC, preventing unreasonable denials of permission to use its proprietary information.  I find Disney's contractual interpretation unconvincing on all points.

Questions of interpretation are generally to be resolved under contract law principles by the court.  See, e.g., DEC Elec., Inc. v. Raphael Constr. Corp., 558 So. 2d 427 (Fla. 1990).  However, where the contract provisions are ambiguous, as may often occur in a complex contractual relationship such as the one between ETC and Disney in this case, questions of fact become critical, and the case must move beyond summary judgment to a jury.  See Commer. Capital Res., LLC v. Giovannetti, 955 So. 2d 1151, 1153 (Fla. 3rd DCA 2007).  I will address ownership rights under Article 28 and confidentiality protection under Article 23 separately below.

(i)     Ownership under Article 28

Disney's reading of Article 28 of the Material Procurement Contract is incomplete and misleading.  Citing only Article 28(b)[12] and (c),[13] Disney asserts "broad ownership

---

[12]Article 28(b) provides:
> Title to all Deliverables produced by Vendor [ETC] pursuant to this Contract arising out of the Work and any inventions, ideas, or original works of authorship in whole or in part conceived or made by Vendor [ETC] which arise from or result from the Work shall be and remain the sole and exclusive property of Buyer [Disney] when produced, whether or

rights to everything created by ETC while under contract" with Disney.  (See Def.'s Br.

8).  By suggesting that Article 28 confers "unfettered" ownership rights to Disney,

however, defendant ignores the provision in Article 28(e) expressly reserving ownership

of pre-existing concepts and technology to ETC.[14]  Article 28(e) provides, in pertinent

part:

> [N]othing in this Article 28 shall be construed as [ETC's] conveyance to
> [Disney] . . . [of] any ownership interest in or license to use any of [ETC's]
> existing data, know-how, processes, concepts, and technology, whether or not any
> such data, know-how, processes, concepts, and technology are incorporated or
> embodied in any deliverables hereunder . . .

> [E]ach party agrees that the data, know-how, processes, concepts, and
> technology of which the other party retains exclusive ownership rights
> under this subparagraph e shall be subject to the provisions of Article 23

---

not fixed in a tangible medium of expression.

[13]Article 28(c) provides:
Vendor [ETC] agrees that any such Deliverables or original works
(collectively "Works") shall be deemed to be "works made for hire" for
Buyer [Disney] . . . and to the extent that such Works are determined not
to constitute "works made for hire" as a matter of law, Vendor [ETC]
hereby irrevocably assigns and transfers such property, and all right, title
and interest therein whether now known or hereafter existing, including
patents and copyrights, to Buyer [Disney] and its successors and assigns.
Vendor [ETC] grants to Buyer [Disney] all rights including, without
limitation, reproduction, manufacturing and moral rights . . . .  Vendor
[ETC] acknowledges that Buyer [Disney] is the motivating force and
factor, and for purposes of copyright or patent, has the right to such
copyrightable or patentable Deliverables produced by Vendor [ETC] under
this Contract.

[14]The Material Procurement Contract does grant a license to Disney to utilize any of
ETC's pre-existing technology that was incorporated into the Deliverables for use in completing
the ride.  (See Def.'s Br. Ex. 2, Art. 28(f).)  However, Article 28(e) explicitly subjects such items
to the confidentiality provision in Article 23. (See id. at Art. 28(e).)

(Confidentiality).

The parties dispute which aspects of the *Mission: Space* "g" force technology existed before the parties entered into the Material Procurement Contract.[15]  This pre-existing data is the very confidential information allegedly shared by Disney with third parties in violation of Article 23.  Summary judgment based on ownership under Article 28 is therefore inappropriate because of the need to resolve this question of fact.

    (ii)    *Confidentiality Protection under Article 23*

The crux of Disney's argument under Article 23 is that if ETC had confidential, proprietary information, it was required to identify this information to trigger Article 23 protection.  (See Def.'s Br. 9.)  Article 23 of the Material Procurement Contract explicitly requires Disney to obtain ETC's "written permission" for each disclosure of confidential information to a third party.  (See Def.'s Br. Ex. 2, Art. 23.)[16]  Both parties agree that

---

[15](See Def.'s Br. 9, n.5. ("Disney disputes that ETC did in fact incorporate any of its pre-existing technology into the Ride."); cf. Pl.'s Mat. Facts ¶ 5 (citing ETC's "extensive work with centrifuge-based motion simulators and ETC's data, know-how, processes, concepts and technology").)

[16]Article 23 contains the following language:

    Either party may, during the course of performing this Contract, have access to and require knowledge regarding materials, data, systems, procedures and other information of or with respect to the other party or its parent, subsidiary or related companies, which may not be accessible or known to the general public, including information concerning its or their hardware, software, proprietary or confidential information that the other party treats as confidential.  Any knowledge acquired by either party from such materials, data, systems, procedures or information or otherwise shall not be used, published, or divulged by either party to any other person, firm, or corporation, in connection whatsoever without first having obtained written permission of the other party, which permission the other

24

Disney never obtained such permission from ETC.  (See Def.'s Mat. Facts ¶¶ 23-28;

Def.'s Br. 10-11; Opp'n Br. 20.)  Therefore, Disney argues that it could not have

breached Article 23 because that Article only becomes operative if ETC identifies pre-

existing, proprietary information.  Disney locates the obligation to identify proprietary

information in the language of the Design Requirements Specifications,[17] a separate

document whose relation to the Material Procurement Contract is hardly clear-cut.

Article 35 of the Material Procurement Contract incorporates Exhibits "A" through "I" by

reference.  Under the Heading "Scope of Work: 1.0 General" the following (rather

obscure) reference to the Design Requirements Specifications appears: "See Mission

Space Design Requirements Specification for the Ride System, Rev. B."  (See Def.'s Br.

Ex. 2, Art. 35; Ex. 2, Ex. "A.")  While it may be unreasonable to expect Disney to identify

---

party may withhold in its sole discretion.  Provided, however, that such
permission may not be unreasonably withheld if disclosure to a third party
is required in order to carry out the obligations of either party under this
Contract.  In such a case, after receipt of permission from the other party
the disclosing party will put a confidentiality agreement in place with the
third party prior to disclosure.
(See Def.'s Br. Ex. 2, Art. 23.)

[17](See Def.'s Mat. Facts ¶¶ 24-25; Def.'s Br. Vol. 2, Ex. B, filed under seal, §§ 22,
23.1(e).)  These two provisions state, in relevant part:

**22. DOCUMENTATION**
. . . Proprietary and/or materials with copyrights shall not be used unless
written approval is given by the Owner ("Disney").
**23.1 ALL PHASES**
In addition to the deliverables specific to each phase, the following
submittals shall be made by the Contractor, in writing, at every design
review . . .

e.      Any proprietary, patented and/or materials with copyright
protection.

pre-existing ETC technology without prior notice by ETC,[18] whether notice was a

*prerequisite* to the application of Article 23 cannot be resolved through the plain language

of the Material Procurement Contract and its addenda.  ETC's breach of confidentiality

claims must survive summary judgment on this question.

Disney also submits that Florida law reads a reasonableness requirement into the

denial of written permission.[19]  Disney cites no facts to support the contention that written

permission was ever *requested* let alone unreasonably withheld.  (See Def.'s Mat. Facts

¶¶ 23-28; Def.'s Br. 10-11.)  Because "every disclosure Disney made was with respect to

the Ride," Disney appears to argue that the court should assume that such consent would

have been unreasonably withheld.  (See Def.'s Br. 10.)  However, the facts developed in

discovery, and all reasonable inferences drawn from those facts, show that Disney never

afforded ETC the chance to consent to the disclosures.  In fact, Disney disclosed whatever

it wanted to disclose, without ever consulting ETC.[20]  Therefore, summary judgment is

---

[18](See Reply Br. 9-10 ("ETC attempts to impose a duty on Disney to obtain ETC's written permission before disclosing its proprietary technology despite having failed to tell Disney that the information was proprietary.")

[19]Disney bases this argument on cases arising in the landlord-tenant context, and suggests that the implied covenant of "commercial reasonableness" is a condition precedent to performance.  (See Def.'s Br. 10, n.8.)

[20]Disney acknowledges that it disclosed ETC's confidential information to a number of its vendors.  (See, e.g., Def.'s Mat. Facts ¶ 28 (listing vendors to whom information was disclosed).)  Disney's defense is that each of these disclosures was subject to a confidentiality agreement with those venders.  This does not excuse the breach of Disney's obligation of confidentiality under the Material Procurement Contract.  It does impact ETC's potential damages, discussed in the next section *infra*, IV(A)(1)(d).

inappropriate on this ground as well.

    *d.*   *Damages*

Finally, Disney argues that ETC has suffered no damages, defeating its contract

claim as a matter of law.[21]  Proof of damages is an essential element of a breach of

contract claim.  See Franceschini v. Allstate Floridian Insurance Co., No. 06-1283, 2007

U.S. Dist. LEXIS 13268, at *7 (M.D. Fla. Feb. 27, 2007) ("The elements of a breach of

contract action are: (1) a valid contract; (2) a material breach; and (3) damages.") (citing

American Color Graphics, Inc. v. Brooks Pharmacy, Inc., No. 05-1512, 2006 U.S. Dist.

LEXIS 11698, at *3 (M.D. Fla. March 3, 2006)).  ETC has not demonstrated any actual

loss as a result of Disney's alleged breaches of confidentiality; though other measures

exist for calculating damages, including restitution, ETC has only introduced evidence to

support a claim for potential lost profits caused by Disney's actions.[22]  Disney argues that

---

[21]In support of this contention, Disney cites to Jones v. Law Firm of Hill and Ponton, 223 F. Supp. 2d 1284, 1290 (M.D. Fla. 2002).  This is a legal malpractice case, holding that "a malpractice case is hypothetical and damages are speculative until the underlying action is concluded with an adverse outcome to the client."  Id. at 1288.  This holding is irrelevant to the present inquiry into contract remedies.  Disney goes on to rely exclusively on Pennsylvania authority, despite the parties' choice of Florida law under Material Procurement Contract Article 30.  (See Def.'s Br. 14-15.)

[22]At oral argument, counsel for ETC characterized its loss as follows:
> We lost the monetary value of our established technology in this new market place, which Dr. Kirsch [*sic*] will have explained to [the jury] is calculable based on the value of ETC, as he has examined it.  Based on the public perception that ETC's business would include an entertainment component that it has been precluded from being able to market due to the rumors and innuendos and obfuscation about whether they have the right to do so.

(Hr'g Tr. 52:5-12.)  Dr. Samuel J. Kursh's Report is attached as Exhibit 62 to ETC's Opposition

none of the identified third party sub-vendors used the information disclosed for anything other than ride-related work, but this fact alone does not exclude all possible damages flowing from Disney's breach.[23]

It is well established that all damages must be proven with reasonable certainty, and cannot be the product of speculation.  See, e.g., W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd., 545 So. 2d 1348, 1350-51 (Fla. 1989); Twyman v. Roell, 166 So. 215, 218 (Fla. 1936).  Nevertheless, Florida contract law "provides a relatively liberal standard for proving damages." See, e.g., Kona Spring Water Distrib. v. World Triathlon Corp., No. 05-119, 2007 U.S. Dist. LEXIS 19026, at *5 (M.D. Fla. Mar. 19, 2007); G.M. Brod & Co., Inc. V. U.S. Home Corp., 759 F.2d 1526, 1538 (11th Cir. 1985) ("The fact that such damages are difficult to measure and by their nature are uncertain in amount does not render such damages unrecoverable.")

In Florida, courts permit a business to recover for lost profits as a result of breach

---

Brief.  Dr. Kursh limited his economic loss calculations to, at most, a 51-day "event window," from November 19, 1999 through February 2, 2000 (the date ETC's contract with Disney was made public).  (See Opp'n Br. Ex. 62, 15.)  According to Kursh, this "event study" "measures the market's perception of the increase in the value of ETC's intellectual property as a result of successful technology transfer to entertainment."  Id. at 14.  He concludes that "ETC sustained an economic loss ranging between **$13.6** million and **$22.6** million as a result [sic] Disney's alleged unfair competition."  Id. at 2.  Kursh's report makes no reference to breaches of confidentiality, focusing exclusively on unfair competition in the theme park industry.  See id.

[23]For example, ETC questions the enforcement incentives for either party to the confidentiality agreements secured by Disney with third party vendors.  (See Hr'g Tr. 42:6-20 ("[A]lthough ETC may have a very strong interest in preventing its potential competitors from learning the very secrets of its technology and it's [sic] know-how.  [sic] Disney has no such interest.  Disney has no need to go enforce its non-disclosure agreements . . . .").)

"regardless of whether it is established or has any 'track record.'"  Nebula Glass Int'l, Inc.

v. Reichhold, Inc., 454 F.3d 1203, 1214 (11th Cir. 2006); Slip-N-Slide Records, Inc. v.

TVT Records, LLC, No 05-21113, 2007 U.S. Dist. LEXIS 80788, at *29-32 (S.D. Fla.

Oct. 31, 2007) (reviewing recent Florida law on recovery for lost profits).  In order to do

so, "the party must prove that 1) the defendant's action caused the damages and 2) there is

some standard by which the amount of damages may be adequately determined."  Nebula

Glass, 454 F.3d at 1214 (following the holding in Twyman).  In Slip-N-Slide, a Florida

district court further explained the standard:

> The burden of proof is more rigorous with respect to the *fact* of damage
> than to the *amount* of damage.  A plaintiff must show to a reasonable
> degree of certainty that some damage occurred, while a "relaxed burden of
> proof [applies] to ascertainment of the *amount* of damage." (emphasis in
> original)

2007 U.S. Dist. LEXIS 80788, at *30-31; see also Royster Co. v. Union Carbide Corp.,

737 F.2d 941, 948 (11th Cir. 1984) ("The term 'speculative' is basically a

characterization of the evidence introduced to prove the damages.  Proof must show with

reasonable certainty that the plaintiff suffered damages and that the damages flowed as

the natural and proximate result of defendant's wrongful conduct.  Once the causal

connection has been demonstrated, although the impossibility of calculation with

"absolute exactness" will not defeat recovery, the amount of damages must be capable of

proof to a reasonable certainty and not left to speculation or conjecture") (citing Florida

law).

Some Florida case law suggests that even the possibility of nominal damages will sustain a contract claim on summary judgment. See Kona Spring Water, 2007 U.S. Dist. LEXIS 19026, at *5; see also Johnson Enters. of Jacksonville v. Fpl Group, 162 F.3d 1290, 1327 (11th Cir. 1998) ("Under Florida law, . . . when a breach of contract has been established and 'there is insufficient evidence presented to ascertain the particular amount of loss, the award of nominal damages is proper.'") (citing Beverage Canners, Inc. v. Cott Corp., 372 So. 2d 954, 956 (Fla. 3d DCA 1979)).

ETC has not raised a genuine issue as to the fact of damage flowing from the alleged breaches of confidentiality occurring after November 15, 2001, as it must do to survive summary judgment. See Celotex, 477 U.S. at 322. While Florida case law provides plaintiffs with some flexibility in proving damages, including damages for lost profits, that leniency arises only after the fact of damage has been adequately established. See Slip-N-Slide, 2007 U.S. Dist. LEXIS 80788, at *30-31.

In this case, ETC has shown that Disney did not seek permission before disclosing certain alleged proprietary information to third party vendors. ETC has not succeeded in demonstrating any cognizable damage resulting from these disclosures, even if ETC benefits from reasonable inferences drawn from the facts on record. Disney has confidentiality agreements in place, the information disclosed related only to the *Mission: Space* ride, and ETC has not identified a single instance in which a third party released confidential, proprietary information, causing damage to ETC. With insufficient

evidence of damages, ETC also fails to raise a genuine issue as to causation, another requirement for recovering lost profit damages under Florida law.  See, e.g., Royster, 737 F.2d at 948.  I will therefore grant summary judgment on the remaining breach of contract claims under the Material Procurement Contract, i.e. those breach of confidentiality claims arising after the November 15, 2001 Settlement Agreement.

### 2.    *Disclosure of ETC's Installation Proposal and Theft of Its Vendor List*

ETC alleges that Disney copied an installation estimate prepared by ETC for Disney in December 1999, and sent it to Taft Contracting, an ETC competitor, claiming it was created by Disney.  (See Compl. ¶ 90; Opp'n Br. 24-25; Pl.'s Mat. Facts 38-39.) ETC also accuses Disney of misappropriating a list of ETC's vendors, as evidenced by a July 7, 2001 email between Disney engineer Edward Fritz and two other Disney employees, Stewart Robertson and Dale Hailey.  (See Pl.'s Mat. Facts ¶ 38-39; Opp'n Br. 25, Ex. 35; Hr'g Tr. 58:7-18.)[24]  I find both assertions without merit in the context of ETC's breach of confidentiality claim.

The installation plan does not arise out of the Material Procurement Contract for the purpose of allocating title to Disney[25] or applying the release in the November 15,

---

[24]ETC also cites the July 7, 2001 email containing the ETC vendor list as evidence in support of its unfair competition claim.  (See Opp'n Br. 9) ("Disney misappropriated ETC's list of vendors.")  At oral argument, ETC emphasized the relevance of this claim to the unfair competition count.  (See Hr'g Tr. 60:9-19.)  Its relation to the breach of confidentiality claim is tenuous if not altogether absent.

[25]Citing Article 28(b), Disney contends that the Material Procurement Contract "unequivocally assigned to Disney the copyright and ownership rights to everything created by

2001 Settlement Agreement.  Not only does the Material Procurement Contract expressly

exclude installation of the ride from its scope, meaning the subject items could not

constitute "deliverables" under the Material Procurement Contract, but the parties were

also still operating under the terms of the Professional Services Agreement in December

1999.[26]  The Material Procurement Contract had not come into effect at that time.  Disney

excerpts portions of the draft Design Requirements Specifications to suggest that ETC

had a contractual obligation to provide the installation plan.  (See Def.s Mat. Facts 15-

16.)  However, viewing the facts in the light most favorable to ETC, the evidence of

---

ETC while it was under contract with Disney."  (See Def's Br. 13.)  Article 28(b) reads, in
pertinent part,

> Title to all Deliverables produced by Vendor pursuant to *this Contract*
> arising out of the Work and any inventions, ideas or original works of
> authorship in whole or in part conceived or made by Vendor which arise
> from or result from the Work shall be and remain the sole and exclusive
> property of Buyer when produced, whether or not fixed in a tangible
> medium or expression.

(See Def.'s Br. Ex. 2, 11.)  Article 28(e) specifically reserves "existing data, know-how,
processes, concepts, and technology" to ETC, including those items created under the
Professional Services Agreement.  Id.  Therefore, this argument is untenable for Disney.

[26] (See Def.'s Mat. Facts ¶ 17; Pl.'s Mat. Facts ¶¶ 27-29.)  In its Memorandum in Support
of Summary Judgment, Disney describes the installation proposal as a "deliverable" under the
Professional Services Agreement.  (See Def.'s Br. 13 n.13.)  The record does not indicate that the
proposal was submitted as part of the Professional Services Agreement.  Indeed, in his 30(b)(6)
deposition, Michael Lentz, designee of Disney, indicates the contrary.  (See Lentz 30(b)(6) Dep.
19:13-23 ("This ETC proposal would ultimately be provided as a requirement in the Design
Requirements Specifications.  It was required to be submitted when the design was complete.  At
this time the design wasn't complete enough for us to get that deliverable from the contract so we
got this rough proposal and rough outline of items in advance of the design in order to be able to
prepare our estimates.")) The Professional Services Agreement requires a mutually executed
Change Order for any "Additional Services" to fall under its scope.  (See Professional Services
Agreement, Def.'s Br. Ex. 8 ¶ 1(b).)  In the case of the installation plan, neither party has
evidenced that a Change Order was executed to bring this work within the scope of the
Professional Services Agreement.  (See Pl.'s Br. Ex. 8 (Change Orders #1-16 to the Agreement).)

record does not show that the installation plan was submitted pursuant to any obligation

created in the contractual web still developing between the two parties in December 1999.

Under these circumstances, Disney can claim no ownership or license to use the

installation plan within the language of the Material Procurement Contract or the Design

Requirements Specifications.

By the same token, ETC fails to indicate where the contractual obligation of

confidentiality would arise to establish liability for a breach of contract claim.  In its

Statement of Undisputed Facts, ETC points to specific facts indicating that Disney

recognized the confidentiality notice on the installation plan itself, but the notice alone

would not constitute a contract.  (See Def.'s Br. Ex. 9.)[27]  See also Restatement (Second)

of Contracts § 17 (1981) (reciting the basic elements of contract formation, including a

definite offer and mutual assent); Brandt v. Lazard Freres & Co., No. 96-2653, 1997 U.S.

Dist. LEXIS 23705, at *8 (S.D. Fla. Aug. 1, 1997) (discussing contract formation under

Florida law); Atacs Corp. v. Trans World Communs., 155 F.3d 659, 665-666 (3d Cir.

_____

[27]The "Notice of Confidential Data" reads:
>    These data shall not be disclosed outside the Customer's
>    organization and shall not be duplicated, used, or disclosed in
>    whole or in part for any purpose other than to evaluate the
>    Proposal, provided that if an order is awarded to ETC as a result of
>    or in connection with the submission of these data, the Customer
>    shall have the right to duplicate, use, or disclose the data to the
>    extent provided in the order.  This restriction does not limit the
>    Customer's right to use the information contained in the data if it is
>    obtained from another source without restriction.

1998) (discussing contract formation under Pennsylvania law);[28] <u>McGraw-Edison Co. v.</u>

<u>Northeastern Rural Elec. Mbrshp. Corp.</u>, 678 N.E.2d 1120, 1123 (Ind. 1997) (boilerplate

liability disclaimer included in invoice or other routine documents invalid to bar strict

liability claim).  According to ETC's analysis of the contractual relationship at the time,

the installation proposal does not fall under the provisions of either the Material

Procurement Contract (unexecuted) or the Professional Services Agreement (not a

deliverable).[29]  In short, ETC fails to cite an agreement on confidentiality that would

apply.  I will grant summary judgment on this claim.

Regarding Disney's alleged theft of ETC's vendor list in advance of the November

2001 Settlement Agreement, it is hard to see how this accusation fits into ETC's breach of

contract claim.  (<u>See</u> Opp'n Br. Ex. 35.)  ETC argues that a genuine issue of material fact

exists concerning the legality of the means by which Disney obtained the vendor

information.  (<u>See</u> Pl.'s Sur-Reply 7.)  However, whether or not Disney

"misappropriated" the vendor list is irrelevant to ETC's breach of confidentiality claim;

---

[28]Because the installation plan does not arise under the Material Procurement Contract,
the applicable law is open to question.  I do not reach this issue, however, for I find ample
grounds to dismiss the claim under basic principles of contract formation present in both
jurisdictions.  <u>See</u> <u>Lucker Mfg. v. Home Ins. Co.</u>, 23 F.3d 808, 813 (3d Cir. 1994) ("Where there
is no difference between the laws of the forum state and those of the foreign jurisdiction, there is
a 'false conflict' and the court need not decide the choice of law issue.")

[29]The "Confidentiality of Material" provision of the Agreement for Professional Services
covers only information that is deemed confidential flowing *from* Disney to ETC (the
"Consultant").  Therefore, I find no contractual obligation of confidentiality in Disney created by
this Agreement.  (<u>See</u> Def.'s Br. Ex. 8 ¶ 6.)

there is no evidence that the list was shared with any party outside of Disney.  (See Opp'n

Br. Ex. 35 (attaching vendor information in email to two other Disney employees).)

Indeed, at oral argument, counsel for ETC stated that Disney's action furnishes evidence

of its "efforts to undermine ETC's position with its subcontractors, with its customers and

in the market place."  (Hr'g Tr. 60:18-19.)  This point goes to the plaintiffs' unfair

competition claim in Count III.  It is irrelevant to a breach of confidentiality claim.  I

therefore find the evidence insufficient to preserve ETC's breach of contract claim on

summary judgment, and I will grant the defendant's motion as to Count I in its entirety.

B.      Count II: Breach of Contract – Oral Agreement on Title Blocks

I will likewise grant summary judgment on Count II.  ETC alleges that Disney

reneged on an oral agreement to acknowledge ETC in the title block on drawings for

*Mission: Space*.  Claiming that the governing provisions of the Disney Design

Requirements Specifications are ambiguous as to the proper attribution on title blocks,

ETC argues that the parties reached an oral agreement with respect to the appearance of

title blocks.  However, ETC's claim must fail because (1) no reasonable juror would find

the provisions of the Design Requirements Specifications ambiguous regarding the

appearance of the title blocks on *Mission: Space* drawings, and (2) the oral agreement

would have been overridden by the merger clause[30] in the November 15, 2001 Settlement

---

[30]Article 36 of Change Order No. 22 states:
> This Contract supersedes any and all agreements, either oral or written,
> between the parties hereto with respect to the rendering of Work by
> Vendor for Buyer and contains all the covenants and agreements between

Agreement.

A plain reading of the Design Requirements Specifications provisions addressing title blocks leaves no ambiguity as to the proper format.  (See Def.'s Br. 15-16.)  Section 22.1, paragraph 4 of the Design Requirements Specifications provides, "[a]ll drawings shall use the [Disney] format and title block."  (See Def.'s Br. Ex. B 220.)  Section 22.1, paragraph 6 states, "[d]rawings created by [ETC] shall be Class 2 drawings in accordance with IGDL-174925, Delivery Requirements for Vendor Created Drawings."  Id.  IGDL-174925 clearly spells out what ETC-generated title blocks should look like:

> Class 1 Drawing – The vendor [ETC] creates a drawing for Disney, that for all intents and purposes, looks exactly like it was created within a Disney (in-house) engineering design group.  In this case, the vendor is acting as an extension to the Disney design team, and therefore the AutoCAD standards per ISTD-150861 WDC Inter-Origin AutoCAD Agreement and the drafting requirements per ISTD-167922 Minimum Drafting Requirements for Vendor Created, Disney Owned Drawings would be required.

> Class 2 Drawing – Identical to Class 1 drawing with the exception that the Sorcerers Mickey logo is replaced by the vendors [sic] name, logo, or company identifier.

(See IGDL-174925, Def.'s Br. Ex. 10 5-6.)  Thus, the Design Requirements Specifications and its addendum left only one option for altering title blocks to indicate ETC involvement: replacing the Sorcerers Mickey logo with ETC's logo.  The purported

---

the parties with respect to the rendering of such Work.  Each party to this Contract acknowledges that no representations, inducements, promises, or contracts, orally or otherwise, have been made by any party, or anyone acting on behalf of any party, which are not embodied herein, and that no other agreement, statement, or promise not contained in this Contract shall be valid or binding.

36

oral agreement on joint title blocks between Thomas McCann, Disney's Senior Vice President of Engineering, and William F. Mitchell, Sr., of ETC, occurred in late September 2001, less than 2 months before the parties reached the November 15, 2001 Settlement Agreement.  (See Pl.'s Mat. Facts ¶¶ 41-42.)  To demonstrate that an agreement was even reached, however, ETC submits an email from Thomas McCann to Edward Fritz and Michael Lentz, both Disney personnel, that merely forwarded Mr. Mitchell's request to have joint title blocks.  (See Opp'n Br. Ex. 39.)   This is not evidence of an agreement, which ETC must be prepared to show at the summary judgment stage.  See Celotex, 477 U.S. at 322.

ETC also takes inconsistent positions on when it first discovered that Disney had allegedly begun to "replace" the title blocks.  In its opposition brief, ETC argues that Disney did not breach the oral agreement until after the November 15, 2001 settlement; in its statement of facts, however, ETC states that the discovery was made in mid-2001. This inconsistency undermines ETC's response to Disney's second argument for dismissal, namely, that the Settlement Agreement's release should preclude all or part of the breach of contract claim in Count II.  However, the court need not reach this issue because any oral agreement would be superceded by the Settlement Agreement.  (See Change Order No. 22 and attached Settlement Agreement, Def.'s Br. Ex. 6, Art. 36.)  I will grant the defendant's motion for summary judgment as to Count II.

C.    Count III: Unfair Competition

ETC alleges that Disney's actions constitute unfair competition under Pennsylvania law by (1) misleading the public in the belief that Disney owned or invented the *Mission: Space* ride, and (2) diverting business from ETC through the wrongful use of confidential information.  Disney has asserted two affirmative defenses to the claim in Count III: (1) that the two-year statute of limitations has expired, rendering the claim time-barred; and (2) that the claim is likewise barred by the Pennsylvania "gist of the action" doctrine.

### 1.    *ETC's Unfair Competition Claim*

Under Pennsylvania law, unfair competition is "anything done by a rival in the same business by imitation or otherwise designed or calculated to mislead the public in the belief that, in buying the product offered by him for sale, they were buying the product of another manufacturer." B.V.D. Co. v. Kaufmann & Baer Co., 116 A. 508, 508-09 (Pa. 1922).  To prove unfair competition under Pennsylvania common law, "a plaintiff must show the involvement of goods or services, a false description or designation of origin with respect to the goods or services involved and a reasonable basis for the belief that one has been injured." International Hobby Corp. v. Rivarossi S.p.A., 1998 U.S. Dist. LEXIS 9932 (E.D. Pa. 1998); see also Allen-Myland v. International Bus. Mach. Corp., 746 F. Supp. 520, 553 (E.D. Pa. 1990) (noting that the elements of an unfair competition claim are identical to a Lanham Act claim, absent the interstate commerce

38

requirement); <u>Moore Push-Pin Co. v. Moore Business Forms, Inc.</u>, 678 F. Supp. 113, 116

(E.D. Pa. 1987).

Pennsylvania also recognizes the Restatement (Third) of Unfair Competition

definition of common law unfair competition:

> One who causes harm to the commercial relations of another by engaging in
> a business or trade is not subject to liability to the other for such
> harm unless . . . the harm results from . . . acts or practices of the actor
> determined to be actionable as an unfair method of competition, taking into
> account the nature of the conduct and its likely effect on both the person
> seeking relief and the public.

Restatement (Third) of Unfair Competition § 1(a) (1995). <u>See</u> <u>Fresh Made, Inc. v. Life</u>

<u>Way Foods</u>, Civ. A. No. 01-4254, 2002 U.S. Dist. LEXIS 15098, at*35 (E.D. Pa. Aug. 9,

2002). Section 1(a), read together with Comment g, contemplates a fluid, "residual rule

of liability" for unfair practices that defies a definitive test. <u>See</u> Restatement (Third) of

Unfair Competition § 1(a), cmt. g. Courts often look to "generalized standards of fairness

and social utility" as a compass for assessing whether a practice is unfair under the

"residual rule" of Section 1(a). <u>Id.</u> Generally speaking, despite the broad language

contained in the Restatement, "courts have . . . been reluctant to interfere in the

competitive process." <u>Id.</u> "A person seeking relief under the residual rule . . . bears the

burden of establishing that the method of competition employed by the actor is unfair."

<u>Id.</u> ETC specifically invokes the illustration in Comment g, contemplating liability for

"[a] competitor who diverts business from another . . . through the wrongful use of

confidential information." Id.[31]

I have already dismissed ETC's claim that Disney disclosed confidential information to third party vendors in violation of the Material Procurement Contract, all but obviating the need to examine this shading of plaintiff's unfair competition claim based on the Restatement's residual rule.  In the simplest terms, ETC cannot point to any facts in the record that would reasonably demonstrate wrongful use of confidential information by Disney in order to divert business away from ETC.[32]  While Disney failed to secure permission for its disclosures under Article 23 of Material Procurement Contract, there is no credible showing of damage to ETC from Disney's disclosure of

---

[31]While ETC has elsewhere accused Disney of "misappropriating" certain of its allegedly proprietary information and ideas, plaintiff declines to set out a formal claim of misappropriation under the doctrine of International News Service v. Associated Press, 248 U.S.214 (1918).  (See, e.g., Opp'n Br. 9, 25 (citing "misappropriation" of vendor list and installation plan as evidence of other counts).)  See Blackmon v. Iverson, 324 F. Supp. 2d 602, 609 (E.D. Pa. 2003) (finding that Pennsylvania recognizes the tort of misappropriation).  In Sorbee Int'l Ltd. v. Chubb Custom Ins. Co., 1999 Pa. Super. 178, 735 A.2d 712 (1999), the Pennsylvania Superior Court set out the three elements of a common law tort of misappropriation: (1) the plaintiff "has made a substantial investment of time, effort, and money into creating the thing misappropriated such that the court can characterize the 'thing' as a kind of property right," (2) the defendant "has appropriated the 'thing' at little or no cost, such that the court can characterize defendant's actions as 'reaping where it has not sown,'" and (3) the defendant "has injured the plaintiff by the misappropriation."  See also Blackmon, 324 F. Supp. 2d at 609.

[32]ETC points to the involvement of independent consultant Frank Weigand to show that Disney has somehow used confidential information in order to interfere with ETC's efforts to market its product to other potential customers in the amusement park industry.  (See Hr'g Tr. 41:9-21.)  The contention that Disney, in 2001, disclosed confidential information to Mr. Weigand, a consultant on the same project, in order to compete with ETC in future projects, is speculative beyond reasonable inferences.  Furthermore, the statute of limitations would apply to bar a claim based on disclosures more than two years before October 14, 2005.

allegedly proprietary information to vendors working on the *Mission: Space* ride.  Indeed,

Disney has come forward with evidence to show that every alleged disclosure was made

with respect to the ride project, under the terms of the contractual relationship that

developed between the parties for that very purpose.  (See Def.'s Br. 10.)  The only

remaining characterization of Disney's actions as unfair competition is the suggestion that

Disney has created confusion in the marketplace regarding the ownership of the "multi-

arm centrifuge-based" technology behind *Mission: Space*.  (See Opp'n Br. 8; Hr'g Tr.

39:16-24.)

        Just as federal antitrust and consumer protection laws, such as the Lanham Act,

require proof that the complainant and defendant are competitors in a relevant market,

courts have looked for a similar showing in order to make out a claim for common law

unfair competition.  See Fresh Made, 2002 U.S. Dist. LEXIS 15098, at * 35 (dismissing

plaintiff's common law claim because the allegations "suffer[ed] from the same

deficiencies in how Fresh Made [] attempted to define market share and the relevant

market" under the Sherman Act); see also Yeager's Fuel, Inc. v. Pa. Power & Light Co.,

953 F. Supp. 617, 668 (E.D. Pa. 1997) (declining to dismiss common law unfair

competition claim because, inter alia, factual questions remained as to whether the

plaintiff could define a relevant market); Rudolph v. Yari Film Group Releasing, No. 06-

1511, 2007 U.S. Dist. LEXIS 13574 (D.N.J. Feb. 23, 2007) (holding that an unfair

competition claim based on misappropriation is not preempted by federal intellectual

property law because an extra element of direct competition is required) (citing United States Golf Association v. St. Andrews Systems, Data-Max, Inc., 749 F.2d 1028, 1039 (3d Cir. 1984)).

ETC has not come forward with adequate facts to demonstrate that Disney is its competitor in the multi-arm, centrifuge-based technology amusement park ride market.[33] Disney and ETC were locked in an owner-vendor relationship for the entirety of the Mission: Space project, confounding any effort to conceive of the two entities as competitors for the purposes of an unfair competition claim.  See Bretford Manufacturing, Inc. v. Smith System Manufacturing Corp., 419 F.3d 576, 580-81 (7th Cir. 2005) (Easterbrook, J.) ("No one makes a product from scratch, with trees and iron ore entering one end of the plant and a finished consumer product emerging at the other. Ford's cars include Fram oil filters, Goodyear tires, Owens-Corning glass, Bose radios, Pennzoil lubricants, and many other constituents; buyers can see some of the other producers' marks (those on the radio and tires for example) but not others, such as the oil and transmission fluid.")  At the summary judgment stage, ETC must present more than unsubstantiated accusations of "surreptitious" behavior by Disney and other entities

_____

[33]Even describing the proposed relevant market tends to belie the credibility of ETC's unfair competition claim.  See Fresh Made, 2002 U.S. Dist. LEXIS 15098, at * 35.  ETC produced a report prepared by Dr. Samuel Kursh, D.B.A. to establish that a market exists for centrifuge-based ride technology.  At oral argument, ETC also cited several examples of major parks interested in developing centrifuge-based rides, such as the Chicago Museum of Science and Technology.  (See Hr'g Tr. 41:19-25.)  I will accept, for the purpose of summary judgment, ETC's contention that a market exists, with the facts and reasonable inferences therefrom drawn in favor of the plaintiff.

connected with the *Mission: Space* project in order to show that Disney was somehow engaging in acts of unfair competition as an industry rival.  (See Hr'g Tr. 41:10.)

### 2.    *Statute of limitations*

Not only has ETC failed to show it is Disney's competitor in any identifiable market, but the record also lacks viable evidence of unfair competition that falls within the applicable statute of limitations for tort actions in Pennsylvania.

Disney argues that, because the first instance of unfair competition identified by ETC falls outside of the two-year statute of limitations for tort claims in Pennsylvania,[34] the claim must fail in its entirety.   However, "continuing behavior by the defendant underlies the unfair competition claim, which vitiates the statute of limitations issue." Envt'l Tectonics v. Walt Disney World Co., No. 05-6412, 2006 U.S. Dist. LEXIS 23387 (E.D. Pa. Apr. 26, 2006).  This Circuit has explicitly recognized the "continuous tort" doctrine in the misappropriation of trade secrets context.  See, e.g., Harry Miller Corp. v. Mancuso Chem. Ltd., 469 F. Supp. 2d 303, 317 (E.D. Pa. 2007) (holding that each time defendant used plaintiff's allegedly stolen formula, the statute of limitations began to run, giving the plaintiff a new two-year period in which to file suit).  ETC cites specific

---

[34]The parties do not dispute that unfair competition is a tort claim, nor do they dispute the length of the statute of limitations under Pennsylvania law.  See 42 Pa.C.S, § 5524; Debiec v. Cabot Corp., 358 F.3d 117, 128-29 (3d Cir. 2003) (Pennsylvania statute of limitations begins to run from the moment the claimed injury resulting from unfair competition occurs).  In this case, filed December 13, 2005, acts before December 13, 2003 are outside the statutory period.  Disney argues that ETC first publicly recognized acts of unfair competition pleaded in its complaint as early as October 14, 2003, in a press release.

instances of conduct allegedly constituting unfair competition, rather than merely claiming continuous injury flowing from one violation.  Under these circumstances, the statute of limitations starts to run anew with each successive act.  See id.

Because at least one of the alleged acts of unfair competition falls within the two-year statutory period, the defendant's argument does not bar ETC's unfair competition claim entirely.  The statute of limitations does severely limit the basis upon which ETC could advance that claim.  In fact, based on a review of the plaintiff's Statement of Material Facts, and oral and written arguments presented to this court in support of Count III, only a few statements made within the statutory period even remotely suggest that the *Mission: Space* ride concept was proprietary to Disney.[35]

In short, the evidence that is not barred by the statute of limitations could not convince a reasonable jury that Disney has engaged in acts of unfair competition to cloud the title to the technology behind *Mission: Space*.  Considering the paltry evidence of record to support ETC's claim, together with its failure to show how it is even in competition with Disney to market this technology, I will dismiss Count III as well.

---

[35]ETC cites five statements in particular that were allegedly intended to "cloud the title" to the centrifuge technology, one of which was made by counsel for Disney in connection with this litigation and is therefore not actionable.  See Panitz v. Behrend, 632 A.2d 562, 564 (Pa. Super. Ct. 1993) (describing the litigation privilege under Pennsylvania law as applicable to torts claims).  The remaining statements are either not attributable to Disney, or amount to no more than mere puffery in an effort to promote the *Mission: Space* ride.  (See Opp'n Br. 8-9; Def.'s Br. 2-4.)

*3.*       *Gist of the action doctrine*

Finally, Disney asserts that the "gist of the action" doctrine bars ETC from asserting a claim for unfair competition.  The gist of the action doctrine bars only those tort claims (1) that arise solely from a contract between the parties; (2) where the duties allegedly breached were created or grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract.  McCloskey v. Novastar Mortgage, Inc., Civ. A. No. 05-1162, 2007 WL 320287, at *6 (E.D. Pa. Jan. 29, 2007).  Having dismissed the plaintiff's unfair competition claim on other grounds, I do not reach this issue.

**V.    CONCLUSION**

Based on the foregoing, I will grant the defendant's motion for summary judgment in its entirety.  An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ENVIRONMENTAL TECTONICS** | : | |
| **CORPORATION, and** | : | |
| **ENTERTAINMENT** | : | |
| **TECHNOLOGY CORPORATION,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 05-6412** |
| | : | |
| **WALT DISNEY WORLD CO. d/b/a** | : | |
| **WALT DISNEY IMAGINEERING,** | : | |
| **Defendant** | : | |

**O R D E R**

**STENGEL, J.**


**AND NOW**, this 26th day of March, 2008, upon consideration of Defendant's

Motion for Summary Judgment (Document #41), it is hereby **ORDERED** that the motion

is **GRANTED** as to all counts in the Plaintiff's complaint.  Judgment is entered in favor

of the Defendant.  The Clerk of the Court is directed to close this case for all purposes.



BY THE COURT:



 /s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.